UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

| | | |
|---|---|---|
| J.T.,<br><br>Petitioner,<br><br>v.<br><br>CAROLYN RILEY, in her official capacity as Superintendent, Chittenden Regional Correctional Facility; DONALD J. TRUMP, in his official capacity as President of the United States; DAVID WESLING in his official capacity as Acting Boston Field Office Director, Immigration and Customs Enforcement, Enforcement and Removal Operations; DAVID W. JOHNSTON, in his official capacity as Vermont Sub-Office Director of Immigration and Customs Enforcement, Enforcement and Removal Operations; DAVID VENTURELLA, in his official Capacity as Acting Director, United States Immigration Customs Enforcement; RODNEY S. SCOTT, in his official capacity as Commissioner for United States Customs and Border Protections; MARKWAYNE MULLINS, in his official capacity as Secretary of the United States Department of Homeland Security; TODD BLANCHE, in his official capacity as Acting U.S. Attorney General,<br>Respondents. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Case No.  2:26-cv-00194 |

**ORDER**
(Doc. 1)

Petitioner J.T. filed a Petition for Writ of Habeas Corpus, pursuant to 28 U.S.C. § 2241,

seeking her release from immigration detention. (Doc. 1.) Respondents include various federal

officials ("Respondents") and Carolyn Riley, in her official capacity as the Superintendent of

Chittenden Regional Correctional Facility ("Superintendent"), the jail where J.T. is currently detained. Petitioner was arrested by Immigrations and Customs Enforcement ("ICE") on or about December 12, 2025. She has been detained at the Chittenden Regional Correctional Facility in Burlington, Vermont since February 6, 2026. An evidentiary hearing was held on the Petition on June 18, 2026. Additional evidence was submitted on June 22, 2026. For the following reasons, the court GRANTS the Petition for Writ of Habeas Corpus.

### Factual Background[1]

Petitioner was born in Haiti. She entered the United States through the San Ysidro, California port of entry with her husband and her two minor children on or about June 10, 2024. J.T. was granted humanitarian parole into the United States which permitted her to be in the United States until April 18, 2025. On the same date, J.T. was given a Notice to Appear ("NTA"), which initiated removal proceedings and directed her to appear at an immigration court hearing on April 13, 2026. Petitioner speaks Haitian Creole. The NTA indicates oral notice of its contents was provided to Petitioner in Creole.

Petitioner, her husband, and two children reside in Chicopee, Massachusetts. Petitioner was arrested and detained by ICE on or about December 12, 2025, following her arraignment in Chicopee District Court in Massachusetts on a misdemeanor charge of assault and battery on a household member. The court has no further information about the facts underlying this charge. Petitioner has remained detained since that date. She was initially detained at the Cumberland

---

[1] The factual record has been compiled from the parties' filings and evidence presented in connection with the hearing. The court admitted several exhibits during the hearing. The court deferred ruling on the admissibility of Exhibit C, but now concludes the document is inadmissible hearsay. While Petitioner's expert may rely on this report in reaching her conclusions, it is not independently admissible as substantive evidence and the court does not find that its probative value, absent testimony by its author, is sufficiently probative. F.R.E. 703. Additional exhibits were submitted following the hearing. Exhibits U and V are audio files that are admitted by stipulation. Petitioner's Exhibits W and Y are admissible for the sole purpose of establishing they were filed in the District of Massachusetts case. Petitioner's Exhibit X is admitted for the sole purpose of establishing the request for humanitarian release was sent to Immigration and Customs Enforcement on January 23, 2026.

2

County Jail in Maine until she was transferred to an ICE Enforcement and Removal Operations office in late January 2026. J.T. was transferred to the Chittenden Regional Correctional Facility on or about February 6, 2026. She remains detained at that facility.

Petitioner has a history of mental illness. She was hospitalized at the MiraVista Behavioral Health Center in November 2025 for eight days, where she was diagnosed with schizoaffective disorder and other psychotic disorders. Although ICE had been provided with information regarding her diagnoses, this information was not provided to mental health or medical staff at Chittenden Regional Correctional Facility at the time of her transfer.

Upon her arrival at Chittenden Regional, J.T. initially refused to participate in a medical intake screening. A medical note prepared on February 12, 2026 indicates that she "has been housed in Alpha Unit since 02/06/2026. Per facility report, detainee has not engaged with DOC staff or medical services and has not completed intake procedures or signed required paperwork. As a result, she has not transitioned to general population and remains in holding status." (Doc. 1-13 at 41).

Medical records reflect an initial medical assessment was able to be completed on February 13, 2026. At that time, J.T. denied ever being diagnosed with a mental health condition and further denied having been hospitalized for mental health reasons over the past year. (*Id.* at 37.) She acknowledged she was given medication at another detention facility, but she did not remember what the medications were or what they were for. At the completion of the medical intake, J.T. was transferred to general population.

The next contact between a health care provider and J.T. appears to have occurred on February 25, 2026 as a result of a referral from a Department of Corrections employee. The medical note reflects that the mental health provider met with J.T. "in MH office in response to

3

multiple EOSR reports and DOC referral." (*Id.* at 50.)[2]  The referral is quoted in the medical records as follows:

> I am writing to request an urgent mental health meeting with [J.T.] due to escalating concerns regarding her mental status and overall safety. Over multiple attempts to communicate with her using the translator service, she continues to provide responses that are unrelated to the questions asked or directions given. Despite consistent efforts to engage her appropriately, meaningful communication has not been successful. There are increasing concerns about her ability to care for herself. She is currently refusing to shower and is demonstrating significant hygiene neglect. At this time, she is menstruating and has been bleeding through her clothing without taking steps to address it. Her lack of hygiene is beginning to impact the unit environment, and other incarcerated individuals have become increasingly distressed and vocal about the odor and sanitation concerns. Given the combination of disorganized responses, refusal of hygiene care, and declining self-care, I am concerned about her mental stability and personal safety. I am requesting that Mental Health assess her as soon as possible to determine appropriate interventions. Additionally, please advise whether temporary segregation may be necessary for her safety and the overall stability of the unit should her condition continue or worsen. Thank you for your prompt attention to this matter.

(*Id.*)

In meeting with J.T., the mental health provider noted that J.T. reported no issues other than her mattress being on the floor. She denied having any need for feminine hygiene products and was agreeable to taking a shower and changing her clothes. Specifically, Petitioner denied a history of mental health conditions. She did not know where she was located. She knew the month and year but did not know the date. She denied speaking with an attorney and reported that she did not need one, as "God is my lawyer." (*Id.*) In response to being asked about auditory or visual hallucinations, J.T. responded, "it is difficult to explain." (*Id.* at 51.)

The mental health provider's assessment concludes that it was difficult to evaluate J.T. due to the language barrier. The assessment notes reported,

---

[2] The court is unaware what the abbreviation "EOSR" stands for in this quotation.

> [S]ome of [Petitioner's] responses do indicate the possibility of a MH concern. Some of her issues may also be attributed to cultural differences and difficulty communicating with staff and peers in this facility. After [Petitioner] left the office, [the clinician] inquired with the interpreter whether [Petitioner's] speech was coherent and flowing naturally, Interpreter responded, "it appears she may be having some mental health issues.

(*Id.*) J.T. was moved to the mental health unit to allow for closer observation and visibility to staff members.

Initially, mental health professionals met with J.T. once a week. The provider's notes reflect that some of her answers may reflect mental health concerns, but it is difficult to assess. The weekly mental health appointments were changed to monthly in March 2026. J.T. was also provided with the opportunity to participate in weekly mental health groups, although the groups were not translated into a language she can understand. She did, however, participate in the group on February 27, 2026 and May 29, 2026. The note for the latter group described J.T. as "engaged" even though there was no interpreter service. Interestingly, the medical records consistently document one of Petitioner's strengths to be her willingness to engage with mental health.

Katarzyna Brown is a licensed mental health counselor and the mental health director at Chittenden Regional Correctional Facility. She has met with J.T. personally and works closely with other mental health staff at the correctional facility. She believes that Chittenden Regional can provide appropriate care to J.T. and testified that J.T. is not a danger to herself or others. Ms. Brown acknowledged that neither she nor her colleagues were aware of Petitioner's prior hospitalization or diagnoses until the week before her testimony. When she was provided with notice of the court hearing, she received some of J.T.'s medical records. When Ms. Brown received these records, she met with J.T. Petitioner continued to deny a mental health history or the need for mental health treatment. Although Ms. Brown reported that Petitioner did not experience auditory or visual hallucinations, she acknowledged that J.T. reported hearing things

in her dreams and sometimes sees things that others cannot see. Ms. Brown believed that when J.T. described seeing things that others could not see, she believed she meant that she found objects others were looking for. After receiving the medical records and subsequently meeting with J.T., Ms. Brown placed a referral to a psychiatric nurse practitioner who will see J.T. within two weeks of the referral.

Norma Wassel, a licensed clinical social worker who has worked in mental health for fifty-two years, conducted an evaluation of Petitioner at the request of her attorneys. Ms. Wassel concurred with the diagnosis that had been previously given to J.T. of unspecified schizoaffective spectrum and other psychotic disorders. Ms. Wassel based her opinion on prior records related to J.T., as well as her observations of J.T., whom she described as preoccupied, unable to make eye contact with Ms. Wassel, rocking back and forth, and acting as if she was reacting to internal stimuli. Ms. Wassel described her as having disorganized thinking, with some thoughts being delusional. According to Ms. Wassel, it was common for J.T. to either give contradictory answers or not answer questions at all. While Ms. Wassel considered J.T.'s cultural background in assessing her, Ms. Wassel concluded J.T.'s thoughts were beyond the limits of religiosity. Ms. Wassel concluded that J.T. had a severe impairment with no awareness or insight into her mental illness. Ms. Wassel testified that if untreated, Petitioner could further decompensate, which can result in increased hallucinations, inability to care for herself, and paranoia.

J.T. testified at the hearing held on June 18, 2026. During the hearing, J.T. exhibited many of the same characteristics described by Ms. Wassel. It was difficult for J.T. to be placed under oath as she questioned what she was being asked to do. At one point, she indicated she would not answer any questions. The court found that J.T. took seriously her obligation to speak truthfully. She testified that she was in a courtroom but did not know why she was in prison. When asked if

she heard voices, she refused to answer, advising that was personal and there are things that people should not know. When asked if she can see things that others cannot see, she responded that "many people are able to see things others cannot see." She denied experiencing any mental health issues and denied being hospitalized for mental illness. When asked about medications, she acknowledged taking some medications when given to her. It is unclear if she was describing being given shots or some other type of medication, as she stated that she had taken two cartons of medication and three shots many months before. J.T. described meeting a doctor many times where the provider talks at her.

In addition to the language barrier hindering a mental health assessment, it has also created difficulties in J.T.'s detention. J.T. was moved out of the mental health unit and subject to disciplinary segregation for two days for failing to follow the order of a correctional officer to move to a top bunk, even though the order was never given to her in Haitian Creole.

### Procedural Background

At the time of their arrival in the United States, Petitioner, her husband and two children were granted humanitarian parole, which allowed them to enter the country. Petitioner's husband applied for asylum on February 18, 2025. His application included Petitioner and their two children as derivative applicants.

J.T. was arrested by ICE following her arraignment on a criminal charge in Massachusetts. After being in custody for approximately one month, J.T.'s counsel submitted a humanitarian request for release to ICE on January 23, 2026. The request cited Petitioner's serious mental health condition and attached medical records from MiraVista Behavioral Health Center documenting her November 2025 hospitalization and diagnosis of schizoaffective disorder and other psychotic disorders. The request for humanitarian release was denied on February 2, 2026, stating: "No

7

compelling humanitarian reason or significant public benefit to warrant approval. Parole denied."
(Doc. 1-24 at 2.)

On the same day that J.T.'s counsel asked ICE to release J.T. on humanitarian grounds, they also filed a Petitioner for Writ of Habeas Corpus in the District of Massachusetts. *J.T. v. Wesling*, No. 1:26-cv-10292, ECF No. 1 (D. Mass. Jan. 23, 2026) (this court changed the caption of the Massachusetts' case to reflect this court's decision to refer to Petitioner by her initials). On January 30, 2026, Respondents filed a notice of their intent to transfer J.T. to Texas. *Id.* at ECF No. 16. In response to Petitioner's opposition to the transfer, Respondents filed an updated notice of their intent to transfer J.T. to Chittenden Regional Correctional Facility. *Id.* at ECF No. 17. On February 4, 2026, the District of Massachusetts granted the request to transfer to Vermont, noting the Court would retain jurisdiction over the case. *Id.* at ECF No. 22. The Court further requested an update as to Petitioner's access to medication and mental health support while at the Chittenden Facility. *Id.*

While the Petition for Writ of Habeas Corpus was proceeding in the District of Massachusetts, immigration proceedings also continued. On March 4, 2026, Petitioner filed an independent asylum application. The Immigration Court in Chelmsford, Massachusetts held a competency hearing on March 5, 2026 in connection with her removal proceedings. At the conclusion of that hearing, the Immigration Judge found Petitioner to be "incompetent based on a doctor's diagnoses for unspecified Schizophrenia spectrum and Other Psychotic Disorder and [her] answers and interactions to the Court during the hearing." (Doc. 1-3 at 2.). Procedural safeguards were then permitted to be used by her attorneys during the merits hearing. For example, counsel was permitted to ask leading questions of Petitioner to permit the development of her testimony

and limitations were placed on the manner of cross-examination given her mental health struggles. J.T.'s attorneys also filed a Motion to Terminate the immigration proceedings.

On April 17, 2026, the District of Massachusetts denied J.T.'s Petition for Writ of Habeas Corpus. *J.T. v. Wesling*, No. 1:26-cv-10292, ECF No. 28 (D. Mass. Apr. 17, 2026). The Court found that J.T. was subject to mandatory detention under 8 U.S.C. § 1225(b)(1), rather than subject to discretionary detention under 8 U.S.C. § 1226(a), as argued by Petitioner. *Id.* The Court also summarily rejected Petitioner's claims that "a transfer outside of New England would violate her rights" under the Constitution, the Immigration and Nationality Act, and the Administrative Procedures Act. *Id.*

On May 15, 2026, the Immigration Judge granted the Motion to Terminate the immigration proceedings pursuant to 8 C.F.R. § 1003.18(d)(1)(i)(B). This regulation provides that termination of removal proceedings is mandatory where "[f]undamentally fair proceedings are not possible because the alien is mentally incompetent and adequate safeguards are unavailable." § 1003.18(d)(1)(i)(B). The Department of Homeland Security ("DHS") filed a timely notice of appeal on May 21, 2026. That appeal before the Board of Immigration Appeals ("BIA") remains pending. The parties still await notification of a briefing schedule. J.T.'s attorney again communicated with ICE, requesting her release following the termination of her proceedings. Petitioner's counsel represents that ICE has not acknowledged receipt of that email or responded to the request.

The Petitioner for Writ of Habeas Corpus was filed in this District on June 4, 2026. (Doc. 1.) The court issued a Temporary Restraining Order prohibiting J.T.'s removal from this District on June 5, 2026. (Doc. 21.) The court extended the Temporary Restraining Order on June 18,

9

2026. (Doc. 52.) The criminal case in the Chicopee District Court was dismissed on June 10, 2026 as "[f]urther prosecution of this case is not in the interests of justice." (Doc. 49-2 at 5.)

The court held an evidentiary hearing on the Petition for Writ of Habeas Corpus on June 18, 2026. Petitioner raises three issues. First, Petitioner asserts she is not subject to mandatory detention under 8 U.S.C. § 1225(b)(1), citing prior decisions of this court which found that a noncitizen whose parole has expired is not subject to mandatory detention. (Doc. 1 at 15–17.) Second, Petitioner asserts that her Due Process rights under the Fifth Amendment were violated when she was detained by ICE without notice or an opportunity to be heard and that her Due Process rights continue to be violated by her ongoing detention. (*Id.* at 22–23.) Finally, Petitioner asserts that the Vermont Department of Corrections has been deliberately indifferent to her medical needs. (*Id.* at 24.)

Because the court concludes that J.T.'s continued detention violated her Due Process rights under the Fifth Amendment and grants the Petition on that basis, the court will not address the other arguments raised by Petitioner. *See Walizada v. Trump*, No. 2:25-cv-00768, 2025 WL 3551972, at *15 (D. Vt. Dec. 11, 2025) ("This court need not resolve this statutory question because [Petitioner] also asserts a constitutional due process challenge to his ongoing detention.").

## Conclusions of Law and Analysis

### I.    Standard of Review

Subject to some exceptions, federal district courts are authorized to grant the writ of habeas corpus "within their respective jurisdictions." *Rasul v. Bush*, 542 U.S. 466, 473 (2004) (citation modified). "At its historical core, the writ of habeas corpus has served as a means of reviewing the legality of Executive Detention . . . ." *Kapoor v. DeMarco*, 132 F.4th 595, 610 (2d Cir. 2025) (quoting *INS v. St. Cyr*, 533 U.S. 289, 301 (2001)) (internal quotation marks omitted). "[A]bsent

10

suspension, the writ of habeas corpus remains available to every individual detained within the United States." *Hamdi v. Rumsfeld*, 542 U.S. 507, 525 (2004) (plurality opinion) (quoting U.S. Const. art. I, § 9, cl. 2).

## II.   Whether Petitioner's Continued Detention Violates Due Process

The District Court in Massachusetts found J.T. was subject to mandatory detention pursuant to 8 U.S.C. § 1225(b)(1). *J.T. v. Wesling*, No. 1:26-cv-10292, ECF No. 28 (D. Mass. Apr. 17 2026). This finding by the District of Massachusetts conflicts with previous decisions in this District that have found parolees, whose parole has expired pursuant to 8 U.S.C. § 1182(d)(5)(A), are not returned to the status of "arriving aliens," insofar they are not "seeking admission" and not subject to the mandatory detention provision of 8 U.S.C. § 1225(b)(2). *Graterol Ruiz v. Trump*, No. 2:26-cv-00012, 2026 WL 323254, at *3–6 (D. Vt. Feb. 6, 2026); *see also Cabrera-Lopez v. Hyde*, No. 2:26-cv-00017, 2026 WL 540131, at *4–7 (D. Vt. Feb. 26, 2026). Petitioner, in this case, as well as in the case before the District of Massachusetts, has argued she is not subject to mandatory detention under Section 1225(b)(2). (Doc. 1. at 15–16.) Respondents have raised the doctrine of collateral estoppel to argue that this court should not "entertain re-litigation" of which statutory authority rules Petitioner's detention. (Doc. 30 at 6.)

This court does not need to resolve the question of collateral estoppel because Petitioner also asserts a constitutional due process challenge to her ongoing detention. "Accordingly, even if [Petitioner's] detention is mandated by his perpetual status as an 'arriving alien' due to his initial parole, a conclusion that appears to be absurd in the facts and circumstances of this case, the court must still consider whether his continued detention satisfies due process." *Walizada*, 2025 WL 3551972, at *15.

11

J.T. argues her detention violates her due process rights since the Government failed to provide an "individualized custody determination," meaning there has been no assessment of her flight risk or danger to the community. (Doc. 1 at 23.) Without the assessment, J.T. contends her continued detention serves no legitimate government purpose. (*Id.*)

Respondents contend J.T.'s detention does not violate the Constitution because "[d]etention during removal proceedings is a constitutionally valid aspect of the deportation process." (Doc. 30 at 9 (quoting *Velasco Lopez v. Decker*, 978 F.3d 842, 848 (2d Cir. 2020).) Additionally, Respondents cite the Supreme Court's decision in *Demore v. Kim*, 538 U.S. 510 (2003), which found the Government may permissibly detain removable immigrants during "the limited period necessary for their removal proceedings." *Id.* at 526.

This court and many courts in the Second Circuit have found that individuals detained under 1225(b)(2) can raise Due Process Clause violations. *Rashid v. Trump*, 807 F. Supp. 3d 349, 363 (D. Vt. 2025); *Walizada*, 2025 WL 3551972, at *16–17; *Golloo v. Akshar*, No. 9:26-cv-401, 2026 WL 1110266, *6 (N.D.N.Y. Apr. 24, 2026). The Due Process Clause of the Fifth Amendment protects the right of "any person" from "be[ing] deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. "Freedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that [the Due Process] Clause protects." *Zadvydas v. Davis*, 533 U.S. 678, 690 (2001) (citation omitted). "The Due Process Clause applies to all 'persons' within the United States including [noncitizens], whether their presence is here lawful, unlawful, temporary, or permanent." *Id.* at 693 (citation modified).

The Second Circuit, in *Black v. Decker*, 103 F.4th 133 (2d Cir. 2024), held that detention—specifically detention that could be "indefinite" or "potentially permanent"—under 8 U.S.C.

12

§ 1226(c) without an individualized assessment would violate due process. *Id.* 142–44. The Court held "due process bars the Executive from detaining [noncitizens] for an unreasonably prolonged period under section 1226(c) without a bond hearing." *Id.* at 143.

Although the Second Circuit considered an alternate statute in *Black v. Decker*, the reasoning is persuasive in the present case. *See Rashid*, 807 F. Supp. 3d at 364. The Second Circuit relied on two Supreme Court's decisions on prolonged detention in civil immigration cases under different statutes. *See Zadvydas*, 533 U.S. at 683–85 (requiring a bond hearing after six-months of detention when an individual is detained pursuant to 8 U.S.C. § 1231); *Demore*, 538 U.S. at 527 (holding detention under 8 U.S.C. § 1226(c) without a bond hearing, but acknowledged the "brevity of detentions pending removal" (quoting *Black*, 103 F.4th at 144)).

The court finds the Executive cannot detain a noncitizen under Section 1225(b) for an "unreasonably prolonged period" without an individualized determination. *Black*, 103 F.4th at 145. Prolonged detention requires "additional procedural requirements" when there has not been an initial bond hearing. *Id.*

## III.    Whether Petitioner's Detention is Unreasonably Prolonged

The Second Circuit instructs courts to use the flexible framework articulated in *Mathews v. Eldridge*, 424 U.S. 319 (1976). *Black*, 103 F.4th at 150. For challenges to prolonged detention, courts "proceed on a 'case by case' basis . . . ." *Walizada*, 2025 WL 3551972, at *17 (quoting *Black*, 103 F.4th at 150). Although the Second Circuit has yet to address how to evaluate detention under 1225(b), this court and other courts in the Second Circuit have held the *Mathews* factors apply. *Id.*; *De Souza Ribeiro v. Turek*, No. 2:26-cv-15, 2026 WL 783775, at *9 (D. Vt. Feb. 23, 2026); *see also Valdez v. Joyce*, 20205 WL 1707737, at *3 (S.D.N.Y. June 18, 2025).

13

The *Mathews* test requires a petitioner to identify a property or liberty interest, and then the court will evaluate whether constitutionally sufficient process has occurred. *Mathews*, 424 U.S. at 332–33. The determination is made using the three-factor balancing test provided in *Mathews*: (1) "the private interest that will be affected by the official action;" (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards;" and (3) "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Id.* at 335.

## A. Liberty Interest

Petitioner has asserted the "most significant liberty interest there is—the interest in being free from imprisonment." *Velasco Lopez*, 978 F.3d at 851 (citing *Hamdi*, 542 U.S. at 529). "Case after case instructs us that in this country liberty is the norm and detention 'is the carefully limited exception.'" *Id.* (quoting *United States v. Salerno*, 481 U.S. 739, 755 (1987)).

J.T. has been detained for seven months without an individualized determination to assess the constitutionality of her detention. Petitioner was taken into custody by ICE after she was arraigned on a misdemeanor criminal charge on or about December 12, 2025. Since she has been detained, the prosecutors in her criminal case have declined to pursue charges, an immigration judge has found her incompetent, and her removal proceedings have been terminated. Although DHS has filed an appeal in the termination of her removal proceedings, the parties cannot provide a timeline on when the BIA will provide a briefing schedule for this appeal. Further, the BIA may sustain DHS' appeal and remand Petitioner's case back to an Immigration Judge to reconsider the case, and presumably J.T.'s current mental health status. The losing party at the BIA may also

14

seek an appeal with the First Circuit. This process creates an unknown timeline but potentially translates to Petitioner being detained for, at best, many additional months.

"[W]hile mandatory detention without a bond hearing may be constitutional at the outset, the Second Circuit has held that, as the period of confinement increases, 'so do the required procedural protections no matter what level of due process may have been sufficient at the moment of initial detention.'" *Rashid*, 807 F. Supp. 3d at 368 (quoting *Velasco Lopez*, 978 F.3d at 852)). While there is no set time frame at which detention without a bond hearing would become unconstitutional, this court has held detention for three months to be unreasonably prolonged. *See Walizada*, 2025 WL 3551972, at *18.

Similarly to the petitioner in *Rashid*, an immigration court has terminated J.T.'s removal proceedings, and the Government appealed the case to the BIA. "[T]he BIA can take months—or longer—to issue a decision on appeal." *Rashid*, 807 F. Supp. 3d at 368 (citing *Banda v. McAleenan*, 385 F. Supp. 3d 1099, 1119 (W.D. Wash. 2019) (noting an "appeal to the BIA could take up to two years or longer")). Considering the first *Mathews* factor, the court finds these circumstances weigh in favor of Petitioner.

## B. Risk of Erroneous Deprivation

The second *Mathews* factor, "the risk of an erroneous deprivation of such [private] interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards[,]" also weighs in J.T.'s favor. *Mathews*, 424 U.S. at 335. At this stage in the analysis, the primary interest is of the detained individual, not the Government. *See Velasco Lopez v. Decker*, 978 F.3d 842, 852 (2d Cir. 2020). This court has recognized that when a noncitizen is detained pursuant to Section 1225(b), there is "no statutory right to an individualized bond hearing to test the need for detention." *Walizada*, 2025 WL 3551972, at *19. Thus, individuals detained

15

under § 1225(b) lack a meaningful process to have their detention reviewed or justified, which heightens the risk of deprivation of one's personal liberty.

The risk of erroneous deprivation is heightened for J.T. in particular. J.T. has been found incompetent by an immigration judge who later terminated her removal proceedings because "fundamentally fair proceedings are not possible" even with the use of additional procedural safeguards. Since that finding, J.T. has remained in custody with no procedural protections to challenge her detention. Further, although this court is not considering Petitioner's claim of deliberate indifference to Petitioner's serious medical need, Ms. Wassel testified that if Petitioner is not treated, she could decompensate further. In light of Petitioner's serious mental health needs, and the lack of process to test the legitimacy of her detention, the court finds the second *Mathews* factor weighs heavily in favor of Petitioner.

### C. Burden on the Government

The third *Matthews* factor considers the burden to the Government. *Mathews*, 424 U.S. at 335. "Respondents have a 'weighty interest in the efficient administration of the immigrations laws at the border.'" *Savane*, 801 F. Supp. 3d at 494 (quoting *Landon v. Plasencia*, 459 U.S. 21, 34 (1982)). Further, the Second Circuit has acknowledged the Government's "legitimate" and "well-established" interests in "ensuring the noncitizen's appearance at proceedings" and "in protecting the community from noncitizens" who are considered dangerous to the community. *Black*, 103 F.4th at 153.

Respondents have not identified any interest in the prolonged and unspecified detention of J.T. Further, Respondents have not identified any burden they would bear if J.T.'s petition were granted.

16

The court acknowledges Petitioner was originally detained at an arraignment for a misdemeanor assault on a member of her household. That case, however, has been dismissed, and neither party has provided evidence to suggest J.T. would be a danger if released. In fact, Respondents have provided evidence to suggest J.T. has not been a danger to herself or any other detained individuals. Additionally, the court cannot find any evidence to suggest J.T. and her representatives would not continue to appear at immigration hearings in the future.

Having considered all the *Mathews* factors, the court concludes J.T.'s detention has been and will continue to be unreasonably prolonged in violation of Petitioner's Due Process rights. Petitioner's detention serves no reasonable and legitimate government purpose.

## ORDER

The court has not been presented with any authority under which it can order the requests made by Petitioner regarding her release. The court, however, is aware of the risks associated with forcing Petitioner out into Burlington, Vermont without means or resources. For this reason, the court is ordering that Petitioner be released at 3:00 p.m. on June 24, 2026. This will provide sufficient time for Petitioner's counsel to arrange transportation for J.T. to Massachusetts. Although Petitioner was not taking any medications at the time of the hearing, the court is aware that she may have seen a psychiatric nurse practitioner since that time. Superintendent Riley is ordered to provide Petitioner, upon her release, with a list of any medications that she is currently taking.

DATED at Rutland, in the District of Vermont, this 23rd day of June 2026.

Mary Kay Lanthier
United States District Court

17